## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| KRISTIN VITA, Individually and on Behalf of All Others Similarly Situated, | No. |
| Plaintiff, | |
| vs. | CLASS ACTION |
| CAREMARK RX, L.L.C.,CAREMARK, L.L.C., CAREMARKPCS, L.L.C., and CAREMARKPCS HEALTH, L.L.C., | DEMAND FOR JURY TRIAL |
| Defendants. | |

## COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION ................................................................................................................ 7

PARTIES AND NON-PARTIES ........................................................................................ 9

SUBSTANTIVE ALLEGATIONS ..................................................................................... 11

    Health Plans in the United States ............................................................................... 11

    The Pharmacy Benefits Industry ................................................................................ 11

    The Relevant Contractual Relationships .................................................................... 13

    The CVS/Caremark Pharmacy Network ..................................................................... 15

    Plaintiff's Plan ............................................................................................................. 17

    CVS/Caremark's Plans Have Standard Terms ............................................................ 18

    Plaintiff's Purchases .................................................................................................... 19

    Plaintiff Exhausted the Administrative Remedies ...................................................... 21

    CVS/Caremark Participants Pay Undisclosed,  Unauthorized and Excessive Prescription Drug Cost Shares ...................................................................................... 22

    Defendants Are Fiduciaries and Parties In Interest ..................................................... 27

    Defendants' ERISA Duties .......................................................................................... 30

    Defendants Breached Their Fiduciary Duties ............................................................. 35

CLASS ACTION ALLEGATIONS .................................................................................... 36

THE STATUTE OF LIMITATIONS SHOULD BE TOLLED ............................................ 40

COUNTS ............................................................................................................................. 41

    Count I  For Violations of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) ............... 41

    Count II  ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)  for Violations of ERISA § 406(a)(1)(C) & (D), 29 U.S.C. § 1106(a)(1)(C) & (D) ........................................ 42

    Count III  ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) for Violations of ERISA § 406(b)(1),(3), 29 U.S.C. § 1106(b)(1),(3) .................................................... 45

    Count IV  ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3)  for Violations of ERISA §§ 404, 29 U.S.C. § 1104 .................................................. 47

    Count V  ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)  for Violations of ERISA § 405(a), 29 U.S.C. § 1105(a) ...................................................................... 51

    Count VI  ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)  for Knowing Participation in Violations of ERISA ................................................................................ 53

PRAYER FOR RELIEF ..................................................................................................... 54

JURY TRIAL DEMAND .................................................................................................... 56

1.       Kristin Vita ("Plaintiff") alleges the following against Caremark Rx, L.L.C., Caremark, L.L.C., CaremarkPCS, L.L.C., and CaremarkPCS Health, L.L.C. ("Defendants" or collectively "CVS/Caremark"), based upon her knowledge, the investigation of Plaintiff's counsel, and upon information and belief. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

2.       Plaintiff, a participant who received prescription drug benefits through a group health plan administered by "CVS/Caremark, Inc." (the "Plan"),[1] brings this action on behalf of herself and a Class of similarly situated persons alleging violations of the Employee Retirement Income Security Act of 1974 ("ERISA") (codified at 29 U.S.C. § 1001 *et seq.*), resulting from Defendants' violation of the Plan by inflating prescription drugs costs causing consumers to pay more than they otherwise should have paid for medically necessary prescription drugs.

3.       About 90% of all United States citizens are now enrolled in private or public health plans that cover some, or all, of the costs of medical and prescription drug benefits. A feature of most of these plans is the shared cost of prescription drugs. Normally, when a patient[2] fills a prescription for a medically necessary prescription drug under his or her health care plan,

---

[1]     Unless otherwise specified, the term "Plans" as used herein includes both health plans that are funded by an employer but administered through "administrative-services-only" ("ASO") contracts between one or more Defendants and the plan, and health plans implemented through an insurance policy underwritten and issued by one or more Defendants to cover medical and prescription drug expenses incurred by the plan. "Plans" also includes both public and private plans and governmental program plans, such as Affordable Care Act, Medicare Part D, Medicare Advantage, or PDP plans. "Plans" subject to ERISA are denoted "ERISA Plans."

[2]     The term "patient" refers to a plan participant or beneficiary under a prescription drug Plan issued or administered by one or more Defendants who purchases prescription drugs pursuant to that Plan.

the plan/insurer pays a portion of the cost and the patient pays the remaining portion of the cost directly to the pharmacy in the form of a copayment (often a set dollar amount), coinsurance (often a percentage of the cost) or deductible payment. Defendants directed the pharmacies to collect these cost-sharing payments on Defendants' behalf from patients at the time the prescription was filled.

4.      Defendants — as prescription benefits managers ("PBMs") and/or administrators of prescription drug benefits — provide and administer pharmacy benefits to patients, including, but not limited to, managing a network of pharmacies that will serve as participating pharmacies at which patients obtain prescriptions; setting and dictating copayment amounts, coinsurance amounts, and deductibles (if applicable) to pharmacies; and processing prescription drug claims and interfacing with patients and pharmacies regarding applicable prescription drug coverage.

5.      As set forth below, Defendants have overcharged patients for the cost of medically necessary prescription drugs. Patients, including Plaintiff and the Class (defined below), paid excessive charges to participating pharmacies for prescription drugs. The amounts that Plaintiff should have paid for cost-shares for prescription drugs was set forth in the Plan and was based on, in part, the actual cost of the prescription drugs she purchased. Unknown to the Plaintiff and Class members, Defendants directed the pharmacies to misrepresent the cost-sharing amounts for prescription drugs and charge Plaintiff excessive amounts, and forced patients to pay excessive cost-sharing amounts. These excessive payments by patients were then retained by the pharmacies or "clawed back" from the pharmacies by Defendants. This is not a matter of mistaken or innocently erroneous calculations: it is a pervasive, intentional scheme to overcharge Plaintiff and everyone similarly situated in connection with their prescription drug purchases.

6.     With respect to prescription drugs received from in-network pharmacies, the Plans set limits on cost-share amounts based on the amount that the pharmacy agreed (with Defendants) to be paid for the respective prescription drug. Specifically, under the Plans, copayments and coinsurance and deductible amounts must be based on the formula found in the Plans. Contrary to the express language of the Plans, Defendants exercised their unilateral discretion to require network pharmacies to charge Plaintiff and the Class unauthorized and excessive cost-sharing amounts for prescription drugs violating the Plans' plain language ("Overcharges"), *sometimes overcharging Plaintiff by more than 63%.*

7.     Moreover, Defendants profited from their scheme by taking or "clawing back" some or all of these Overcharges by requiring the pharmacies to pay the Overcharges to Defendants after the pharmacies collected them from Plaintiff and the Class ("Clawbacks") or by paying less than they would have had they followed the Plans.

8.     For example, as further detailed below, the express language of Plaintiff's 2018 Plan administered by CVS/Caremark promised that her copayment for brand/non-formulary prescription drugs purchased from a retail pharmacy would be equal to the lesser of (a) the cost of the drug or (b) the greater of $35 or 40% of the cost.

9.     On August 9, 2018, Defendants failed to follow the Plan language by unilaterally determining that Plaintiff had to pay a $57.15 copayment to a pharmacy to purchase a brand/non-formulary prescription drug and required the pharmacy to collect this amount from the patient. Unknown to Plaintiff, the $57.15 copayment Defendants required the pharmacy to collect from her as a copayment that was *at least 63% more than the copayment amount set forth in her Plan*. Specifically, because Defendants' contract with the pharmacy provided that the pharmacy would be paid *at most* $80.59 for the prescription, the copayment should have been *at most* $35

- 3 -

(which is greater than 40% of $80.59 (or $32.24)). But, Defendants unilaterally directed and required the pharmacy to charge and collect the $57.15 copayment from Plaintiff, thereby overcharging Plaintiff $22.15 (or 63%).

10.     Had Defendants lived up to their fiduciary, disclosure, and other legal obligations under the Plan, Plaintiff would not have paid more than the $35 amount set forth in the Plan for this prescription drug. Defendants should have and easily could have exercised their unilateral discretion to comply with the terms of Plaintiff's Plan and their fiduciary duties, and determined that the pharmacy should charge and collect from Plaintiff, at a maximum, only $35. Instead, Defendants exercised discretion to impose a mark-up of over 63% beyond the amount set forth in the Plan and required the pharmacy to collect that amount from Plaintiff.

11.     Defendants violated the Plans and breached their ERISA fiduciary duties by exercising their discretion to secretly determine that patients must pay inflated copayments, coinsurance, and deductible payments and then directing pharmacies to collect those inflated copayments, coinsurance, and deductible payments on their behalf (which Overcharges were then either retained by the pharmacies or remitted to Defendants in the form of Clawbacks).

12.     Defendants misrepresented to Plaintiff and the Class the cost-sharing amounts under the Plans and that their cost-sharing amounts were based on the amount that the pharmacy agreed to accept for the drugs, when, in fact, patients were charged and paid an amount based on inflated "costs." By engaging in this conduct, Defendants violated ERISA's fiduciary duties and engaged in prohibited transactions.

13.     Defendants' Overcharge scheme to artificially inflate the costs for medically necessary prescription drugs by overcharging patients, and then to surreptitiously require pharmacies to collect Overcharges or to take Clawbacks is inconsistent with the purposes of the

health care system. For one, patients are paying higher amounts than they otherwise would have paid had Defendants not artificially inflated the payment amounts. Patients are supposed to save money through the use of pharmacy benefits, but in reality, they are charged excessive amounts.

14. Indeed, the very purpose of obtaining or participating in a health plan that includes pharmacy benefits is to enable patients to benefit from the administrator's negotiating and buying power with prescription drug manufacturers and pharmacies. This should result in *reduced* costs for prescription drugs. Patients also pay substantial premiums and other costs and fees, which should cover the other aspects of the prescription drug plans, including their administration. Moreover, PBMs and administrators, such as Defendants, are paid significant fees as compensation for their services that are entirely separate from the Clawbacks at issue here, making the Clawbacks an excess, undisclosed profit in exchange for little to nothing. Accordingly, Plaintiff should not have been charged additional secret Overcharges.

15. As a result of Defendants' scheme to collect Overcharges, Defendants overcharged Plaintiffs and the other Class members for prescription drugs during the Class Period (defined below). Defendants' misconduct has caused Plaintiff and the other Class members to suffer significant damages. Plaintiffs seek relief by bringing the following claims:

16. With regard to ERISA, under Count I, ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a participant or beneficiary may bring an action to enforce her rights under the terms of the plan or to clarify her rights to future benefits under the terms of the plan. Defendants have violated the ERISA Plans by instructing pharmacies to charge Overcharges and taking Clawbacks and they should not be allowed to continue to do so.

17. Under Count II, ERISA § 406(a), 29 U.S.C. § 1106(a), provides that a party in interest shall not receive direct or indirect compensation unless it is reasonable and prohibits

transfers of plan assets and use of plan assets by or for the benefit of fiduciaries and plan service providers. In setting the amount of and taking excessive undisclosed Overcharge compensation and Clawbacks, Defendants allowed and received unreasonable compensation and misused the assets of the ERISA Plans, including Plan and employer contributions under coinsurance Plans and Plan contracts, that provided Defendants with the ability and discretion to extract these funds from patients.

18.     Under Count III, ERISA § 406(b), 29 U.S.C. § 1106(b), provides that a fiduciary shall not deal with plan assets in its own interest or for its own account, act in any transaction involving the plan on behalf of a party whose interests are adverse to participants or beneficiaries, or receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan. In exercising their control over Plan contracts, requiring pharmacies to assess Overcharges and remit Clawbacks to Defendants, and otherwise controlling Plan and employer contributions under coinsurance Plans, Defendants dealt with and received plan assets and consideration for their personal accounts and in their own interest, acted on behalf of parties whose interests are adverse to the interests of the Plans and participants, and received consideration for their own accounts from parties dealing with the Plans in transactions involving the assets of the Plans, in violation of this provision.

19.     Under Count IV, ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan (1) solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan, (2) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting

in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (3) in accordance with Plan documents. By setting the amount of and forcing the pharmacies to collect Overcharges and by taking Clawbacks, Defendants have breached these fiduciary duties.

20.     Under Count V, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which it may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Defendants breached all three provisions.

21.     Under Count VI, even to the extent any Defendant is not held to be fiduciary, that Defendant had actual or constructive knowledge of and participated in and/or profited from the prohibited transactions and fiduciary breaches alleged in Counts II-IV committed by the Defendants who are found to be fiduciaries, and are liable to disgorge ill-gotten gains and/or plan assets and to provide other appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

22.     As further alleged below, Plaintiff seeks to represent a nationwide Class of all insureds and plan participants and beneficiaries whose health Plans are administered by Defendants.

## JURISDICTION

23.     **Subject Matter Jurisdiction.** This court has subject matter jurisdiction over this action pursuant to (a) 28 U.S.C. § 1331, which provides for federal jurisdiction over civil actions arising under the laws of the United States, including ERISA and (b) 29 U.S.C. § 1132(e)(1) providing for federal jurisdiction of actions brought under Title I of ERISA. Further, declaratory

and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202 and Rules 58 and 65 of the

Federal Rules of Civil Procedure.

24.     **Personal Jurisdiction.** ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) provides for

nationwide service of process. Upon information and belief, Defendants are residents of the

United States and subject to service in the United States, and this Court therefore has personal

jurisdiction over them. This Court also has personal jurisdiction over all Defendants pursuant to

Fed. R. Civ. P. 4(k)(1)(A) because they would be subject to the jurisdiction of a court of general

jurisdiction in Rhode Island. Defendants may be found in this District and conduct substantial

business herein: Defendants are authorized to do business in the State of Rhode Island;

Defendants conduct business in the State of Rhode Island and in this District; Defendants

advertise and promote their services in the State of Rhode Island and in this District; Defendants

have sufficient minimum contacts with the State of Rhode Island; Defendants administer health

plans and pharmacy benefits under those plans from the State of Rhode Island; and/or

Defendants otherwise intentionally avail themselves of the markets in the State of Rhode Island

through the marketing and sale of health plans and related products and services in this State so

as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair

play and substantial justice.

25.     **Venue.** Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because a

substantial part of the events giving rise to the claims herein occurred within this District and/or

a substantial part of property that is the subject of the action is situated in this District. Venue is

also proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because

Defendants may be found in this District and some or all of the fiduciary breaches or other

violations for which relief is sought occurred in or originated in this District.

## PARTIES AND NON-PARTIES

26.     Plaintiff, Kristin Vita, is a citizen of Massachusetts. Plaintiff received prescription drug coverage through a health and welfare plan through her employer. The prescription drug benefits were serviced and administered by "CVS/Caremark, Inc." This Plan is a welfare benefit plan subject to ERISA. Under the Plan, Plaintiff Vita was obligated to pay copayments to purchase prescription drugs. As a result of Defendants' scheme, Plaintiff has been injured by paying inflated amounts for medically necessary, covered prescription drugs.

27.     Non-party CVS Health Corporation ("CVS Health"), formerly known as CVS Caremark Corporation, is a Delaware corporation with its principal place of business located in Woonsocket, Rhode Island. CVS Health is an integrated pharmacy health care company providing, inter alia, pharmacy benefit management services, mail order, retail and specialty pharmacy, disease management programs, and retail clinics. The company operates 9,800 retail locations, more than 1,100 walk-in health care clinics, a pharmacy benefits manager with more than 94 million plan members, a senior pharmacy care business serving more than one million patients per year, specialty pharmacy services, and a Medicare Part D prescription drug plan.

28.     In 2017, CVS Health reported an operating profit of $9.5 billion. CVS Health owns or controls, directly or indirectly, the other Defendants.

29.     Non-party CVS Pharmacy, Inc, is a Rhode Island corporation with its principal office located in Woonsocket, Rhode Island. CVS Pharmacy, Inc. operates pharmacy and drug stores in the United States. According to CVS Health's 2017 Annual Report, CVS Pharmacy is "the immediate or indirect parent of approximately 60 entities that operate drugstores, all of which drugstores are in the United States and its territories except approximately 42 drugstores that are operated by Drogaria Onofre Ltda., a Brazil limited liability company that is an indirect subsidiary of CVS Pharmacy, Inc."

- 9 -

30.     CVS/Caremark's pharmacy-benefits business segment is operated through the following Caremark entities: Caremark Rx, L.L.C., Caremark, L.L.C., CaremarkPCS, L.L.C., and CaremarkPCS Health, L.L.C. According to CVS Health's most recent annual report, the Caremark Defendants manage pharmacy benefits for more than 94 million plan members. Upon this information, although not clear from the Plan — because it lists the administrator as "CVS/Caremark, Inc.," which is not the name of an identifiable entity — Plaintiff believes that one or more of the Caremark Defendants administers the Plans of Plaintiff and the Class.

31.     Defendant Caremark Rx, L.L.C., is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. On information and belief, CVS Health is the direct parent company of Caremark Rx, LLC. According to CVS Health's 2017 Annual Report, Defendant Caremark Rx, LLC, is "the parent of the Registrant's pharmacy services subsidiaries, is the immediate or indirect parent of many mail order, pharmacy benefit management,  infusion, Medicare Part D, insurance, specialty mail and retail specialty pharmacy subsidiaries, all of which operate in the United States and its territories."

32.     Defendant Caremark, L.L.C., is a California limited liability company whose principal place of business is at the same location as CVS Health. Caremark PCS, LLC, is a Delaware limited liability. On information and belief, Caremark Rx, LLC, is the sole member of both Caremark, LLC, and Caremark PCS, LLC.

33.     Defendant CaremarkPCS Health, L.L.C. is a Delaware limited liability company doing business as CVS/Caremark and CVS Caremark and whose principal place of business is at the same location as CVS Health. On information and belief, Defendant CaremarkPCS, L.L.C. is the sole member of CaremarkPCS Health, L.L.C.

## SUBSTANTIVE ALLEGATIONS

### Health Plans in the United States

34.     Over 90% of health care beneficiaries in the United States have a health care plan (either private or public) that covers all, or a portion of, their medical and pharmaceutical expenses.

35.     Health insurance is paid for by a premium paid for medical and prescription drug benefits for a defined period; or through employer plans that either provide benefits by purchasing group insurance policies, or are self-funded but administered by health insurance companies and their affiliates. Premiums and contributions for coverage in all types of plans can be paid by individual plan participants or beneficiaries, employees, unions, employers or other institutions.

36.     If a Plan covers outpatient prescription drugs, the cost for prescription drugs is typically shared between the patient and the Plan. Such cost sharing can take the form of deductible payments, coinsurance payments, and copayments. In general, deductibles are the dollar amounts the patient pays during the benefit period (usually a year) before the Plan starts to make payments for drug costs. Coinsurance generally requires a patient to pay a stated percentage of drug costs. Copayments are generally fixed dollar payments made by a patient toward drug costs.

### The Pharmacy Benefits Industry

37.     The pharmaceutical benefits industry consists of complex arrangements between numerous entities, including, but not limited to, drug manufacturers, drug wholesalers, PBMs, pharmacies, health insurance companies, employers, and health plan participants and beneficiaries.

38.     On the drug distribution side of the market, the drug manufacturer typically sells drugs to a drug wholesaler, which in turn sells the drugs to a retail pharmacy. Payments for the drugs in turn go from the retail pharmacy to the wholesaler and to the manufacturer. The retail pharmacy then distributes drugs to patients from its inventory. Neither the PBM nor the insurer/administrator is involved in the distribution of prescription drugs by the retail pharmacies, although PBM's may operate mail-order businesses.

39.     The retail payment side of the market for drugs is largely directed and controlled by insurance companies and health plan administrators, including PBMs. In many instances where a health plan provides for prescription drug benefits, a PBM administers the prescription drug component of a health plan.

40.     When a patient presents a prescription at a pharmacy, key information such as the patient's name, drug dispensed and quantity dispensed is input into the pharmacy computer and transmitted via interstate wire to a "switch" that then directs the information to the correct PBM. Accordingly, the pharmacy instantaneously submits the claim to Defendants on behalf of the patient. The prescription is supposed to be processed by the PBM in accordance with a patient's Plan which, as alleged herein, did not occur. The PBM then electronically transmits via interstate wire a message back to the pharmacy indicating whether the drug and patient are covered and, if so, the cost-sharing amount the pharmacy must charge to and collect from the patient as a copayment, coinsurance, or the amount to be paid toward a deductible.

41.     The PBM is supposed to pay the pharmacy any amounts owed to the pharmacy over the copayment, coinsurance or deductible amount paid by the patient. These amounts are aggregated and paid to the pharmacy approximately every two weeks for the claims that were processed by any given pharmacy in the prior two-week period.

42.     If the patient's cost-sharing payment is greater than the amount the pharmacy has agreed to accept, there will be a "negative reimbursement" to the pharmacy for the difference between the patient's payment and the amount the pharmacy receives. The "negative reimbursement" is paid by the pharmacy to Defendants as part of the reconciliation every two weeks.

### The Relevant Contractual Relationships

43.     Contractual relationships exist at three relevant levels: (1) between the employer (or, in the case of non-employer sponsored plans, the individual) and the entity that underwrites and/or administers the plan; (2) between the administrator and the PBM; and (3) between the PBM and retail pharmacies. An employer or individual buys prescription drug coverage or prescription drug benefit administration services from a company to provide prescription drug benefits for its employees under health plans. When a sponsor does not contract directly with a PBM, a health insurance company may hire a PBM to manage the prescription drug benefits offered pursuant to its policies and ASO contracts. PBMs have relationships with retail pharmacies. Some may be "in-network" and others may be "out of network."

44.     The following diagram represents (in simplified form) the contractual relationships among the parties:



        (a)     **Agreement between employer/individual and administrator/insurer (i.e., health plans).** Employers and individuals buy prescription drug coverage to provide prescription drug benefits. These plans contain uniform provisions that set forth key terms such as the mechanism for and amount of the deductible, copayment, and/or

coinsurance that a patient must pay to obtain prescription drug benefits. Plaintiffs and Class members are intended beneficiaries of such agreements and they are participants and beneficiaries in the plans.

(b)      **Agreement between administrator/insurer and PBM**. In certain circumstances, the administrator or insurer will contract with a PBM, which act as its agent in administering the prescription drug benefits purchased through the health plans that the insurers issue or administer. In other circumstances, the administrator manages the prescription benefits itself.

(c)      **Agreement between administrator/PBM and pharmacy**. For "in-network" benefits at issue in this case, PBMs contract with pharmacies, which serve as providers in the insurers/administrators' pharmacy network. Pursuant to these agreements, the pharmacies fill prescriptions that are health benefits covered under the Plans in exchange for an amount pursuant to the contract with the PBM. Pursuant to these agreements, the pharmacy submits a claim to the PBM on behalf of the patient. The pharmacy has no role in setting the amount of the patient's payment and thus must collect and remit to administrator/PBM the amount overcharged as determined by the administrator/PBM in their sole discretion.

45.      The relationship among the parties is shown graphically as follows:



46.     Pursuant to the health plans, PBMs must follows the plans' terms, including when dictating to pharmacies the amounts to charge patients in cost-sharing payments. In other words, PBMs must not overcharge patients for their prescription drug benefits.

47.     On the contrary, PBMs — whether they are also acting as administrators or as agents with administrators/insurers — routinely require that patients pay substantially higher prices for prescription drugs than are allowed under the plans. As alleged herein, Defendants engaged in such practices with respect to Plaintiff's Plans and the Class by charging Overcharges.

**The CVS/Caremark Pharmacy Network**

48.     The Plan touts that participation in the Plan allows participants to "buy necessary prescription drugs at a reduced cost." But in order to benefit from these lower costs, participants must purchase their prescription drugs at a CVS/Caremark pharmacy, a pharmacy participating in the CVS/Caremark Network, or through a CVS Specialty Pharmacy ("CVS/Caremark Network"). The Plan warns participants, "If You elect to use a pharmacy that is not affiliated with CVS/Caremark, You will be required to pay the full cost of the prescription to the pharmacy" (emphasis in original).

- 15 -

49.     According to CVS Health's most recent annual report, the CVS/Caremark Network consists "of more than 68,000 retail pharmacies, consisting of approximately 41,000 chain pharmacies (which includes [its] CVS Pharmacy locations) and 27,000 independent pharmacies, in the United States, including Puerto Rico, the District of Columbia, Guam and the U.S. Virgin Islands." There are approximately 9,800 CVS Pharmacies in the CVS/Caremark Network with stores in all fifty states, Puerto Rico, and the District of Columbia.

50.     According to CVS Health's most recent annual report, "When a customer fills a prescription in a retail pharmacy, the pharmacy sends prescription data electronically to [CVS/Caremark] from the point-of-sale. This data interfaces with our proprietary prescription management systems, which verify relevant plan member data and eligibility, while also performing a drug utilization review to help evaluate clinical appropriateness and safety and confirming that the pharmacy will receive payment for the prescription."

51.     According to the Plan, pharmacies in the CVS/Caremark Network use the CVS/Caremark system, which is "a nationwide electronic network linked by computers to CVS/Caremark headquarters" (referred to herein as the "CVS/Caremark System"). The Plan states that, "[u]sing this sophisticated system, the pharmacist submits Your prescription drug claim in a few seconds, sending full information and usually with no written claim form."

52.     CVS/Caremark also represented that its Network would be able to deliver even further savings to its plan members beginning in March of this year. CVS/Caremark represented, in relevant part, that it is "able to build client-specific networks and managed network solutions to further drive savings for our clients. These include a performance-based pharmacy network with approximately 30,000 stores that will be anchored by CVS Pharmacy and Walgreens, along with up to 10,000 community-based, independently owned pharmacies across the United States.

The network is designed to deliver unit cost savings and to improve clinical outcomes that will help to lower overall health care costs for participating payors and their members. This network will be available beginning March 2018 to eligible commercial and Medicaid clients."

### Plaintiff's Plan

53.     The Plan provides Plaintiff with certain benefits, which are referred to in the Plan as "Covered Services," including "Pharmacy" benefits.

54.     As a Plan participant, Plaintiff is entitled to prescription drug benefits including, inter alia, "outpatient drugs,"  which are drugs that can be dispensed only by a licensed pharmacist from a written prescription, and selected specialty drugs.

55.     The Plan touts that participation in the Plan allows participants to "buy necessary prescription drugs at a reduced cost." Indeed, the Plan warns that, "[i]f you elect to use a pharmacy that is not affiliated with CVS/Caremark, You will be required to pay the full cost of the prescription to the pharmacy" (emphasis in original).

56.     Pursuant to the Plan, participants do not submit claims for benefits received from network providers, including pharmacies participating in the CVS/Caremark Network. Rather, the pharmacist submits the claim at the point of sale using the CVS/Caremark System.

57.     The following screenshot is from page 41 of the Plan:

> When You give Your business to an CVS/Caremark-affiliated pharmacy, You simply pay Your co-payment when the prescription is filled, and there is no need to submit a written claim form.  You must obtain prescriptions at a CVS/Caremark pharmacy, a pharmacy participating in the CVS/Caremark Network, or through CVS Specialty Pharmacy in order to receive prescription benefits through the health plan.  If You elect to use a pharmacy that is not affiliated with CVS/Caremark, You will be required to pay the full cost of the prescription to the pharmacy.

58.     Under Plaintiff's Plan, the prescription drug benefits were not subject to a deductible and the amount of Plaintiff's cost share for prescription drugs depends on two factors.

First, whether the drug is generic, brand/formulary, or non-brand/formulary. And, second, whether the drug is purchased from a retail pharmacy or a mail-order pharmacy.

59.     Plaintiff's Plan further states that, "If the cost of your prescription is less than the co-pay, you will pay the lesser of the cost of the prescription or the co-pay listed."

60.     The following table summarizes the Plan's terms for calculating Plaintiff's "applicable cost sharing" based on these two factors.

| | Retail | Mail order |
|---|---|---|
| **Generic** | The lesser of:<br>• the cost; or<br>• $8 | The lesser of:<br>• the cost; or<br>• $20 |
| **Brand/ Formulary** | The lesser of:<br>• the cost;<br>• the greater of $20 or 30% of cost; or<br>• $150 | The lesser of:<br>• the cost; or<br>• $75 |
| **Brand/ Non-formulary** | The lesser of:<br>• the cost;<br>• the greater of $35 or 40% of cost; or<br>• $225 | The lesser of:<br>• the cost; or<br>• $100 |

**CVS/Caremark's Plans Have Standard Terms**

61.     The relevant terms of the Plan benefitting Plaintiff are substantively the same as those applicable to the Class. For this reason, upon information and belief, the rights relevant to the claims alleged herein are shared by all members of the Class.

62.     Further, CVS/Caremark uses uniform prescription drug plan terms in their Plan contracts to provide prescription drug coverage. These terms of the Plans — and more importantly, how these Plans are administered by CVS/Caremark — do not differ materially across Plans. Accordingly, upon information and belief, the rights relevant to the claims alleged

herein are shared by all members of the Class, regardless of the funding arrangement underpinning the health Plan benefits that Defendants offer and administer.

### Plaintiff's Purchases

63.     During the time that Plaintiff was covered by the Plan, Plaintiff purchased prescription drugs for which she was required to make cost-sharing payments (e.g., copayments, coinsurance, and/or deductible payments) that exceeded the amounts set forth in her Plan, including at least the following specific purchases:

64.     On August 9, 2018, Plaintiff purchased two prescription drugs, categorized as brand/non-formulary, from her pharmacy and she was told to pay copayments of $57.15 for "Drug 1" and $35.41 for "Drug 2." According to the Plan, Plaintiff's copayment for brand/non-formulary prescription drugs should be the lesser of (a) the cost or (b) the greater of $35 or 40% of cost or (c) $225. Accordingly, based on the amount of the copayments paid by Plaintiff, CVS/Caremark apparently calculated the copayments of $57.15 and $35.41 using costs of $142.88 for Drug 1 and $88.53 for Drug 2.

65.     Plaintiff called her CVS pharmacy and asked the pharmacy staff to provide her with a quote for the uninsured, cash price for Drug 1 and Drug 2 and was told that the cash prices were $80.59 and $46.59, respectively.

66.     The prices that were quoted to Plaintiff by her CVS pharmacy are in line with the average cash prices listed on www.goodrx.com, a website that gathers current prices and discounts to help patients find the lowest cost pharmacy for their prescriptions. According to GoodRx, as of August 23, 2018, the average prices for Drug 1 and Drug 2 were $81 and $46, respectively.

67.     Upon this information, Plaintiff believes the true cost of Drug 1 and Drug 2 under her Plan are *at most* $80.59 and $46.59, respectively. Assuming Drug 1 and Drug 2 cost $80.59

and $46.59, Plaintiff's copayments should have been $35 and $35 — meaning she was

Overcharged $22.15 and $0.41 for Drug 1 and Drug 2, respectively.

68.     The amounts relevant to the two drug purchases described above are summarized

in the following table:

| Drug | Copay should be the lesser of A, B, or C | | | | *Should have paid* | *Paid* | *Diff ($)* | *Diff (%)* | *Copay paid is 40% of:* |
|---|---|---|---|---|---|---|---|---|---|
| | A | B (greater of 40% cost or $35) | | C | | | | | |
| | *Cost* | *40% of cost* | *B* | *Cap* | | | | | |
| Drug 1 | 80.59 | $32.24 | $35.00 | $225.00 | **$35.00** | **$57.15** | **$22.15** | 63.29% | $142.88 |
| Drug 2 | 46.59 | $18.64 | $35.00 | $225.00 | **$35.00** | **$35.41** | **$0.41** | 1.17% | $88.53 |

69.     For Drug 1, Defendants failed to follow the Plan language by unilaterally

determining that Plaintiff had to pay a $57.15 copayment to the pharmacy to purchase this

brand/non-formulary prescription drug and required the pharmacy to collect this amount from the

patient. Unknown to Plaintiff, the $57.15 copayment Defendants required the pharmacy to

collect from her was *at least 63% more than the $35 copayment amount set forth in her plan*.

Specifically, because Defendants' contract with the pharmacy provided that the pharmacy would

be paid *at most* $80.59 for the prescription (reflecting the cost of the drug), the copayment should

have been *at most* $35 (reflecting the greater of either $35 or 40% of the drug's cost (or $32.24)).

But, Defendants unilaterally directed and required the pharmacy to charge and collect the $57.15

copayment from Plaintiff, thereby overcharging Plaintiff *at least* $22.15.

70.     For Drug 2, Defendants failed to follow the Plan language by unilaterally

determining that Plaintiff had to pay a $35.41 copayment to the pharmacy to purchase this

brand/non-formulary prescription drug and required the pharmacy to collect this amount from the

patient. Unknown to Plaintiff, the $35.41 copayment Defendants required the pharmacy to

collect from her represented an overcharge of *at least* $0.41. Specifically, because Defendants'

- 20 -

contract with the pharmacy provided that the pharmacy would be paid *at most* $46.59 (reflecting the cost of the drug) for the prescription, the copayment should have been *at most* $35 (reflecting the greater of either $35 or 40% of the drug's cost (or $18.64)). But, Defendants unilaterally directed and required the pharmacy to charge and collect the $35.41 copayment from Plaintiff, thereby overcharging Plaintiff *at least* $0.41.

71.     As set forth above, Plaintiff was illegally charged Overcharges for these prescription drugs in excess of the amounts permitted by her Plans. Upon information and belief, Defendants then "clawed back" these Overcharges from Plaintiff's pharmacy.

**Plaintiff Exhausted the Administrative Remedies**

72.     Plaintiff exhausted the administrative remedies in her Plan even though such administrative remedies do not apply to Overcharges.

73.     While the Plan contains a two-level appeal process for when claims for benefits are denied, they do not cover the instant Overcharges. Here, after the pharmacy collected the cost-sharing payments and dispensed the drugs, the pharmacy was paid in full. When that occurred, Plaintiff received her prescriptions and received her benefits in full. Accordingly, this case does not concern a denial of benefits or an adverse coverage decision. It concerns an unlawful Overcharge.  Accordingly, the Plan's administrative remedies do not apply.

74.     Notwithstanding this fact, Plaintiff nevertheless filed her first-level appeals concerning the Overcharges on Drug 1 and Drug 2. CVS/Caremark sent Plaintiff two first-level appeal notices dated August 16, 2018, denying her appeals. Both notices appeared to be boilerplate and failed to include the following information as required by the Plan:

- "The reason(s) for the denial and the Plan provisions on which the denial is based."

- "A description of the Plan's appeal procedures and the time limits applicable to such procedures, including a statement of Your right to bring a civil action following a final denial of Your appeal."

- "A statement indicating whether an internal rule, guideline or protocol was relied upon in making the denial and a statement that a copy of that rule, guideline or protocol will be made available upon request free of charge."

75.     The first-level notices did not provide the drug cost or otherwise explain how the copayment was calculated. The notices stated, in conclusory fashion: "Your request for a lower co-pay is denied. You are paying the lowest co-pay possible for the requested drug according to your prescription benefit plan."

76.     Plaintiff filed her second-level appeals concerning the Overcharges on Drug 1 and Drug 2. CVS/Caremark sent Plaintiff two second-level notices dated September 10, 2018, denying her appeals. Both notices appeared to be boilerplate and failed to include the same information omitted from the first-level notices. The notices represented that they were the "final adverse coverage determinations" for her requests even though her prescriptions were covered in full.

77.     Although the second-level notices state that they did not "involve any determination of medical judgment," they further confusingly informed Plaintiff that she "may have the right to ask for an external review" if the claims "contain an element of medical judgment." The second-level notices failed to notify Plaintiff of her right to bring suit under ERISA.

### CVS/Caremark Participants Pay Undisclosed, Unauthorized and Excessive Prescription Drug Cost Shares

78.     Defendants have engaged in a scheme to charge Plaintiff and other patients Overcharges in violation of the Plans as alleged above.

79.     Defendants utilize CVS/Caremark's technology and service platforms, retail network contracting and claims processing services to carry out this Overcharge and Clawback Scheme.

80.     CVS/Caremark uses its platforms to create and implement its unlawful Overcharge Scheme. Defendants exercised their discretion to program and manipulate the CVS/Caremark technology and service platforms to violate the Plan's term and charge greater Cost-Sharing Amounts than the Plans permitted, and they exercised their discretion to input the excessive and unlawful cost-sharing data into the platform system to enable the system to overcharge patients.

81.     Defendants further used their discretion to manipulate the CVS/Caremark System to misrepresent to patients the "Cost-Sharing Amounts (e.g. Co-payment, Coinsurance and Deductible) applicable to Covered Prescription Services" that were inflated, false and in violation of the Plans. Defendants required the pharmacies to make these misrepresentations to Plaintiff and other patients when they filled their prescriptions. For example, Defendants made these misrepresentations to Plaintiff each time she filled a prescription and was advised of and required to pay an excessive Copayment and Spread as alleged above.

82.     Where the patient pays a deductible and/or coinsurance (not a copayment), the patient is overcharged because his or her payment is based on the inflated amount, ***not*** the lower amount paid to the pharmacy. Defendants implemented the scheme concerning these types of cost-sharing in the same way they executed the scheme concerning copayments.

83.     CVS/Caremark's Overcharge Scheme includes various misrepresentations and omissions of material fact, including, but not limited to: (a) the misrepresentation in the Plans that Plaintiffs would pay a certain cost-share amount for prescription drugs with the knowledge

and intent that patients would in fact be charged a higher amount; (b) the misrepresentation of the amount of the cost-sharing payment owed under the Plan terms when a patient purchased a drug; (c) the failure to disclose that a material portion of the "co-payments" were not "co-" payments at all, but were unlawful Overcharges; (d) the failure to disclose that prescription drug payments under deductible portions of health insurance Plans were based on prescription drug prices that exceeded the contracted fee with the pharmacies, in violation of the Plans' plain language; and (e) the failure to disclose that co-insurance payments were based on prescription drug prices that exceeded the contracted fee with the pharmacies, in violation of the Plans' plain language.

84.     A June 28, 2016 press release issued by the NCPA described the "Clawback" practice and how it was impacting pharmacists and consumers throughout the United States.[3] The press release went on to discuss a survey that was conducted by the NCPA of its members between June 2 and June 17, 2016, which disclosed the following:

> "Clawbacks" are relatively common, as 83 percent of pharmacists witnessed them at least 10 times during the past month.
>
> Two-thirds (67 percent) said the practice is limited to certain PBMs.
>
> Most (59 percent) said they believe the practice occurs in Medicare Part D plans as well as commercial ones.
>
> Sometimes PBM corporations impose "gag clauses" that prohibit community pharmacists from volunteering the fact that a medication may be less expensive if purchased at the "cash price" rather than through the insurance plan. In other words,

---

[3]    News Releases, NCPA, Pharmacists Survey: Prescription Drug Costs Skewed by Fees on Pharmacies, Patients (June 28, 2016), http://www.ncpanet.org/newsroom/news-releases/2016/06/28/pharmacists-survey-prescription-drug-costs-skewed-by-fees-on-pharmacies-patients (last visited Jan. 9, 2017); see also Survey of Community Pharmacies, NCPA (2016), http://www.ncpa.co/pdf/dir_fee_pharamcy_survey_june_2016.pdf (last visited Jan. 9, 2017).

the patient has to affirmatively ask about pricing. Most pharmacists (59 percent) said they encountered these restrictions at least 10 times during the past month.[4]

85.     Some of the comments received from the pharmacists who responded to the survey included:

"Got one today. [PBM] charging a patient $125 for a generic drug and take back $65 from the pharmacy. If paid cash the cost to the patient would have been $55."

***

"Simvastatin 90-day charged the patient $30 more than cash price."

***

"[A] patient copay is over $50 and the claw back is over $30 all for a drug while our cash price would only be $15."

***

"The ones that make me the most upset is the Champ/VA claims. Seeing our disabled veterans families paying more than they should is horrific. Many times these fees are multiple times our net margin, even a negative reimbursement at times. One recent copay of $30 while we sent $27.55 back to [PLAN] left our margin at $1.58."

***

"Same patient, same day, five prescriptions. … Total copay $146.89. Total claw back $134.49. Total price of the five prescriptions $12.40. Our gross profit on these five drugs $3.79. These are all maintenance medications for this patient."

***

"Recently filled a buproprion xl 150 script for 30 tabs. Cost is $17.15. PBM required us to charge a patient $47.10 and then took back $35."[5]

86.     Clearly, these examples of Overcharges could not be possible if the true cost and correct cost-share of the prescription drug was disclosed.

––––––––––––––––––––

[4]     *Id.*

[5]     See Community pharmacists describe PBM copay clawbacks on patients, NCPA.CO (2016), http://www.ncpa.co/pdf/06-27-16-copay-clawbacks.pdf (last visited Jan. 9, 2017).

87.     Clawback programs are becoming more and more commonplace in the healthcare industry and have "the effect of duping average consumers of prescription drugs into unwittingly funding [corporate] profits."[6]

88.     Lawmakers, customers, and pharmacists have all raised concerns that there is a dangerous lack of transparency, rendering it difficult to assess whether an insurance policy or plan is being administered in compliance with plan or contract terms.[7]

89.     Potential waste and abuse in the administration of these plans has not gone unnoticed by the Department of Labor — which has the authority to enforce ERISA. In response, the ERISA Advisory Council, established under ERISA, held a hearing in August 2014.

90.     At the hearing, the Council heard testimony regarding "a new PBM phenomenon, called 'clawback'" which takes advantage of the lack of transparency in the PBM industry According to testimony provided to the Council:

> In a "clawback" situation, the patient presents a prescription at a pharmacy. The claim is processed and the pharmacist is instructed to collect $100 as the cost of the drug. The entire prescription is paid for by the patient. Two weeks later, when the pharmacist receives reimbursement from the PBM, his remittance statement shows that the PBM has taken back (clawed-back) $75. This leaves just enough so that the pharmacist may make a few dollars profit on the claim. What happens to the $75 difference? The PBM retains this amount as "Spread" paid for by the patient.[8]

---

[6]     Susan Hayes, Testimony Before the Employee Benefit Security Administration Advisory Council on Employee Welfare and Pension Benefit Plans, U.S. Department of Labor, Hearing on PBM Compensation and Fee Disclosures (Aug. 20, 2014), https://www.dol.gov/sites/default/files/ebsa/about-ebsa/about-us/erisa-advisory-council/AChayes082014.pdf.

[7]     National Community Pharmacists Association, Lawmakers Ask Medicare for More Drug Payment Transparency (Oct. 22, 2015), http://www.ncpanet.org/newsroom/news-releases/2015/10/22/lawmakers-ask-medicare-for-more-drug-payment-transparency.

[8]     Hayes, supra note 22 at 7.

**Defendants Are Fiduciaries and Parties In Interest**

91.     Plaintiff and the members of the Class (as defined below) are participants in employee welfare benefit plans as that term is defined in 29 U.S.C. § 1002(1)(A), insured or administered by Defendants to provide participants with medical care and prescription medications ("ERISA Plans").

92.     ERISA requires every plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

93.     ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). This is a functional test. Neither "named fiduciary" status nor formal delegation is required for a finding of fiduciary status, and contractual agreements cannot override finding fiduciary status when the statutory test is met.

94.     Defendants are fiduciaries of all of the ERISA Plans to which they provided prescription drug benefits or for which they administered prescription drug benefits in that they *exercised* discretionary authority or control respecting the plan and plan asset management activities, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i), and in that they *had* discretionary

authority or discretionary responsibility in the administration of the ERISA Plans of participants and beneficiaries in the Class, ERISA § 3(21)(A)(iii), 29 U.S.C. § 1002(21)(A)(iii).

95.     Defendants **had** fiduciary authority over benefit administration under the ERISA Plans in that they operated and controlled the prescription drug benefits under the ERISA.

96.     Defendants are also fiduciaries because they ***exercised*** fiduciary authority over plan management, in addition to ***having*** fiduciary authority over plan administration. By way of example, they:

(a)     exercised discretion to violate the Plans to calculate and set the amount of and charge patients Overcharges;

(b)     had and exercised discretion to set up a computer system to process prescription drug claims and exercised discretion to program and input data into that system which they used to intentionally set the amount of Overcharges in violation of the Plans (*i.e.*, these were not unintentional miscalculations);

(c)     had and exercised discretion to dictate the amount of and require pharmacies to charge and collect the Overcharges;

(d)     exercised discretion to require the pharmacies to remit some or all of the Overcharges to Defendants as Clawbacks;

(e)     exercised discretion to set their own compensation for services performed as fiduciaries by dictating Overcharges and Clawbacks;

(f)     exercised discretion to unilaterally collect their own compensation for services performed by causing Overcharges and collecting Clawbacks;

(g)     exercised discretion concerning whether to disclose Overcharges or Clawbacks;

(h)      exercised discretion to require pharmacies to misrepresent to patients the proper cost-sharing amounts and prevent pharmacies from disclosing to patients the proper cost-sharing amounts and the manner in which they charged for prescription drugs as alleged above;

(i)      exercised discretion to prohibit pharmacies from disclosing to patients the existence or amount of the Overcharges; and

(j)      exercised discretion to prohibit pharmacies from disclosing to patients that they could purchase drugs at a price lower than the amount set by Defendants by not using their insurance or prescription benefits.

97.      In addition to their fiduciary status under the foregoing provisions, Defendants are fiduciaries in that they *exercised* authority or control respecting management or disposition of plan assets. The insurance and ASO contracts underpinning the Plans are "plan assets" within the meaning of ERISA plan assets, ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i). Additionally, under coinsurance plans, the payments by the Plan and employers (and related trusts) for prescription drugs are plan assets. Defendants used their authority and control over these Plan assets and cost-sharing amounts to implement their Overcharge and Clawback scheme.

98.      Defendants exercised control over the amounts paid by both employers/trusts and participants/beneficiaries by dictating that pharmacies charge Overcharges, as alleged above. Defendants exercised control and authority over the insurance policies, ASO contracts, and PBM agreements in that they used these contracts — from which they derived discretion and control over plan prescription drug management and pricing — to implement the Overcharge scheme, as alleged above.

99.     Defendants are also parties in interest under ERISA because (a) they are fiduciaries, ERISA § 3(14)(A), 29 U.S.C. § 1002(14)(A); and/or (b) they provided plan administration, and/or pharmacy benefit management services to the ERISA Plans, ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B).

100.    As parties in interest, Defendants received direct and indirect compensation for services, some of which was in the form of excess Overcharge or Clawback fees that were collected in exchange for few to no services. Defendants also received and used plan assets for the benefit of themselves and their affiliates to impose their Overcharge and Clawback Scheme on the Class.

101.    Finally, even if any Defendant is found not to be a fiduciary, that Defendant is alternatively subject to equitable relief under ERISA, because it had actual or constructive knowledge of the ERISA violations through its role in the Overcharge and Clawback Scheme.

### Defendants' ERISA Duties

102.    **The Statutory Requirements:** ERISA imposes strict fiduciary duties upon plan fiduciaries. ERISA § 404(a), 29 U.S.C. § 1104(a), states, in relevant part, that:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefit to participants and their beneficiaries; and defraying reasonable expenses of administering the plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims; by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

103.    **The Duty of Loyalty.** ERISA imposes on a plan fiduciary the duty of loyalty — that is, the duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of . . . providing benefits to

participants and their beneficiaries . . . ." The duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

104.   **The Duty of Prudence.** Section 404(a)(1)(B) also imposes on a plan fiduciary the duty of prudence — that is, the duty "to discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. . . ."

105.   **The Duty to Inform.** The duties of loyalty and prudence include the duty to disclose and inform. These duties entail: (a) a negative duty not to misinform; (b) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (c) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

106.   **Prohibited Transactions.** ERISA's prohibited transaction rules bar fiduciaries from certain acts because they are self-interested or conflicted and therefore become per se violations of ERISA § 406(b) — or because they are improper "party in interest" transactions under ERISA § 406(a). As noted above, under ERISA, a "party in interest" includes a fiduciary, as well as entities providing any "services" to a plan, among others. *See* ERISA § 3(14), 29 U.S.C. § 1002(14). ERISA's prohibited transaction rules are closely related to ERISA's duties of loyalty, which are discussed above.

107.    ERISA § 406(a) provides that transactions between a plan and a party in interest are prohibited transactions unless they are exempted under ERISA § 408:

(a) Transactions between plan and party in interest

Except as provided in section 1108 of this title:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect —

(A) sale or exchange, or leasing, of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

(E) acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

29 U.S.C. § 1106(a).

108.    ERISA § 406(b), provides:

A fiduciary with respect to a plan shall not —

(1) deal with the assets of the plan in his own interest or for his own account,

(2) in his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

29 U.S.C. § 1106(b).

109.   **Co-Fiduciary Liability.** A fiduciary is liable not only for fiduciary breaches within the sphere of its own responsibility, but also as a co-fiduciary in certain circumstances. ERISA § 405(a), 29 U.S.C. § 1105(a), states, in relevant part, that:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> > (1)   if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
> >
> > (2)   if, by his failure to comply with section 404(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
> >
> > (3)   if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

110.   **The Duty to Monitor.** In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee or delegatee to protect the interests of the ERISA participants and beneficiaries. As noted above, the power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

111.   **Non-Fiduciary Liability.** Under ERISA, non-fiduciaries — regardless of whether they are parties in interest — who knowingly participate in a fiduciary breach may themselves be liable for certain relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3). Accordingly, as to the ERISA claims, even if any Defendant is not found to have fiduciary or party-in-interest status themselves, they must nevertheless restore unjust profits or fees and are subject to other appropriate equitable relief with regard to the transactions at issue in this action, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and well-established case law. To the extent that any

Defendant is not deemed to be a fiduciary or a party-in-interest with regard to any transaction at issue in this action, they are nevertheless subject to equitable relief under ERISA based on their actual or constructive knowledge of the wrongdoing at issue.

112.     **Rights of Action Under the Plans, for Fiduciary Breach, Prohibited Transactions, and Related Claims.** ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a participant or beneficiary may bring an action to enforce rights under the terms of the plan or to clarify his rights to future benefits under the terms of the plan. Further, ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes individual participants and fiduciaries to bring suit "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." The remedies available pursuant to § 502(a)(3) include remedies for breaches of the fiduciary duties set forth in ERISA § 404, 29 U.S.C. § 1104, and for violation of the prohibited transaction rules set forth in ERISA § 406, 29 U.S.C. § 1106. Further, ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409. ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate. Plaintiffs bring their ERISA claims pursuant to ERISA § 502(a)(3) and (2), as well as § 502(a)(1)(B), as further set forth below,

because not all the remedies Plaintiffs seek are available under all sections of ERISA and, alternatively, Plaintiffs are pleading their claims in the alternative.

**Defendants Breached Their Fiduciary Duties**

113.    Defendants breached the terms of the ERISA Plans, committed breaches of fiduciary duty, engaged in prohibited transactions, and harmed Plaintiff and Class members in the following ways:

(a)    Defendants wrongfully charged Plaintiff and Class members excessive and unlawful copayments and Spread;

(b)    Defendants wrongfully charged Class members excessive and unlawful coinsurance payments in that, rather than charging a percentage of the amounts paid to the pharmacies for the dispensed drugs, the coinsurance payments were based on substantially inflated amounts;

(c)    Defendants wrongfully charged Plaintiff and Class members excessive and unlawful deductible payments in that rather than charging the lesser of the applicable per occurrence deductible fee or the amount paid to the pharmacy for the dispensed drug, Plaintiff and Class members were charged deductible fees that were higher;

(d)    Defendants wrongfully used a computer system — including the CVS/Caremark System — and data they input into that system to charge patients unlawful Overcharges and dictate the excessive amounts pharmacies charged patients for prescription drugs;

(e)    Defendants wrongfully required pharmacies to charge patients unlawful Overcharges;

(f)    Defendants wrongfully required pharmacies to collect the unlawful Overcharges and pay Overcharges back to Defendants as Clawbacks;

- 35 -

(g)      Defendants wrongfully misrepresented to patients the proper cost-sharing amounts at the time patients filled their prescriptions and were charged by pharmacies;

(h)      Defendants misrepresented their cost-sharing terms, practices and procedures in the Plan terms;

(i)      Defendants willfully failed to disclose to patients the proper cost-sharing amounts and the manner in which they charged for prescription drugs;

(j)      Defendants wrongfully determined the amount of and collected additional unlawful undisclosed Clawback compensation;

(k)      Defendants wrongfully determined the amount of and collected additional unlawful undisclosed Clawback premium payment;

(l)      Defendants set, changed, and collected their own compensation for services performed as fiduciaries by collecting Clawbacks;

(m)      Defendants failed to stop injuries to plan participants caused by their co-fiduciaries and service providers; and

(n)      Defendants failed to monitor their agents, appointees, formal delegatees, and informal designees in the performance of their fiduciary duties.

## CLASS ACTION ALLEGATIONS

114.    Plaintiff brings this action as a class action pursuant to Rule 23(b)(1), (2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and the Class defined as follows:

**Class**. All participants or beneficiaries who are enrolled in a health benefit plan administered by CVS/Caremark and subject to ERISA who purchased one or more prescription drugs pursuant to such plan and paid an amount for such drug(s) that was higher than the payment amount provided by the plan.

115. Excluded from the Class are Defendants, any of their parent companies, subsidiaries, and/or affiliates, their officers, directors, legal representatives, and employees, any co-conspirators, all governmental entities, and any judge, justice, or judicial officer presiding over this matter.

116. Plaintiff reserves the right to redefine the Class prior to certification.

117. **Class Period.** Plaintiff will seek class certification, losses, and other available relief for fiduciary breaches and prohibited transactions occurring within the entire period allowable under ERISA § 413, 29 U.S.C. § 1113, including its fraud or concealment tolling provisions and the doctrine of equitable tolling. Further, Plaintiff reserves the right to refine the Class Period after they have learned the extent of Defendants' fraud, the length of its concealment, and the time period during which "Clawbacks" were taking place.

118. This action is brought, and may properly be maintained, as a Class action pursuant to Fed. R. Civ. P. 23. This action satisfies the numerosity, typicality, adequacy, predominance, and superiority requirements of those provisions.

119. The Class is so numerous that the individual joinder of all of its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiff believes that the total number of Class members is in the thousands and that the members of the Class are geographically dispersed across the United States. While the exact number and identities of the Class members are unknown at this time, such information can be ascertained through appropriate investigation and discovery.

120.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff's claims, and the claims of all Class members, arise out of the same conduct, policies and practices of Defendants as alleged herein, and all members of the Class are similarly affected by Defendant's wrongful conduct.

121.    There are questions of law and fact common to the Class and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

(a)    Whether Defendants are fiduciaries under ERISA;

(b)    Whether Defendants are parties in interest under ERISA;

(c)    Whether Defendants breached their fiduciary duties in failing to comply with ERISA as set forth above;

(d)    Whether Defendants' acts as alleged above breached ERISA's prohibited transaction rules;

(e)    Whether Defendants knowingly participated in and/or knew or had constructive knowledge of violations of ERISA, including breaches of fiduciary duty;

(f)    Whether Defendants violated the Plans' terms by authorizing or permitting pharmacies to collect and then remit Overcharges, including Spread amounts to them and thereby overcharged subscribers for prescription drugs;

(g)    Whether the members of the Class have sustained losses and/or damages and/or Defendants have been unjustly enriched, and the proper measure of such losses, and/or damages, and/or unjust enrichment; and

(h)    Whether the members of the Class are entitled to declaratory and/or injunctive relief.

- 38 -

122.     Plaintiff will fairly and adequately represent the Class and has retained counsel experienced and competent in the prosecution of class action litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipates no difficulty in the management of this litigation as a class action.

123.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

124.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

125.     Class action status is also warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants.

126.     Class action status in this action is warranted under Rule 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to each Class as a whole.

127.    Class action status in this action is warranted under Rule 23(b)(3) because questions of law or fact common to members of the Class predominate over any questions affecting only individual members, and class action treatment is superior to the other available methods for the fair and efficient adjudication of this controversy. Joinder of all members of the Class is impracticable.

128.    Plaintiff reserves the right to invoke any provision of Rule 23 appropriate at the time Plaintiff moves to certify the class or otherwise address class certification issues.

## THE STATUTE OF LIMITATIONS SHOULD BE TOLLED

129.    Plaintiff and the Class are entitled to tolling of ERISA's statute of limitations due to fraud or concealment.

130.    By its nature, Defendants' Overcharge and Clawback Scheme has hidden Defendants' unlawful conduct from injured parties.

131.    Neither Plaintiff nor Class members knew of the Overcharge and Clawback Scheme, nor could they have reasonably discovered the existence of the Overcharge and Clawback Scheme, until shortly before filing this action.

132.    Until recent news broke about Defendants' Overcharge and Clawback Scheme, their unlawful conduct was hidden from Plaintiff and the Class.

133.    To the extent that any of the causes of action alleged infra are subject to a specific statute of limitations, Defendants' fraud or concealment alleged herein tolls those requirements, for a specific amount of time to be determined as the litigation progresses.

134.    Further, ERISA's statute of limitations for fiduciary breach claims, ERISA § 413, 29 U.S.C. § 1113, provides that "in the case of fraud or concealment, [an] action may be commenced not later than six years after the date of discovery of such breach or violation."

135.    The Overcharge and Clawback Scheme — by its nature a secret endeavor by Defendants — remains hidden from most members of the Class. Moreover, during the Class Period, as defined above, each Defendant actively and effectively concealed its participation in the Overcharge and Clawback Scheme from Plaintiffs and other members of the Class through "gag clauses" and secrecy policies. There is no question that Plaintiffs' claims are timely.

## COUNTS

### Count I

### For Violations of ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B)

136.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

137.    ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) provides that a participant or beneficiary may bring an action to enforce rights under the terms of the plan or to clarify her rights to future benefits under the terms of the plan.

138.    As set forth above, as a result of being overcharged for prescription drugs, Plaintiff and the Class have been and likely will continue to be denied their rights under the Plans to be charged a lower amount for their prescriptions.

139.    Plaintiff and the Class have been damaged in the amount of the Overcharges, including Spread. Plaintiff and the Class are entitled to recover the amounts they have been overcharged.

140.    Plaintiff and the Class are entitled to enforce their rights under the terms of the plans and seek clarification of their future rights and are entitled to an order providing, among other things:

(a)    That they have been overcharged;

- 41 -

(b)      For a declaration that they have a right under the ERISA Plans to pay no more for prescription drugs than the Plans specify;

(c)      For a readjudication of claims;

(d)      For an accounting and calculation of Defendants' profits from the Overcharge scheme;

(e)      For payment of all amounts due to them in accordance with their rights under the ERISA Plans; and

(f)      For an order enjoining future Overcharges and Clawbacks or any other additional amounts that conflict with their rights under the ERISA Plans.

## Count II

### ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
### for Violations of ERISA § 406(a)(1)(C) & (D), 29 U.S.C. § 1106(a)(1)(C) & (D)

141.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

142.    ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C), provides that a fiduciary shall not cause a plan to engage in a transaction if it knows or should know that the transaction constitutes the payment of direct or indirect compensation in the furnishing of services by a party in interest to a plan.

143.    ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), provides that a fiduciary shall not cause a plan to engage in a transaction if it knows or should know that the transaction constitutes the transfer to, or use by or for the benefit of a party in interest, of any assets of the plan.

144.    As alleged above, Defendants are fiduciaries of the ERISA Plans of the participants and beneficiaries in the Class. Defendants are also parties in interest under ERISA in

that they are fiduciaries and/or they provided prescription drug insurance and/or administrative "services" to Class members pursuant to the ERISA Plans. ERISA § 3(14)(A) & (B), 29 U.S.C. § 1002(14)(A) & (B). Thus they were engaged on one or both sides of these § 406(a) prohibited transactions.

145.     As parties in interest, Defendants received direct and indirect compensation in the form of undisclosed compensation, including Clawbacks, in exchange for the services they provided to Plaintiff and the Class pursuant to their prescription drug Plans. ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C).

146.     Such transactions are strictly prohibited unless three requirements are met: (1) the services are necessary for the operation of a plan, (2) the services are furnished under a contract or arrangement that is reasonable; and (3) the compensation was reasonable. ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2).

147.     While the burden is on Defendants to invoke and establish this exception, the compensation paid to each Defendant pursuant to each prohibited transaction was not reasonable under ERISA § 408(b)(2), 29 U.S.C. § 1108(b)(2) in that the compensation was excessive and/or unreasonable in relation to the value of the services provided. Defendants' compensation was also unreasonable because it exceeded the premiums and other fees that were agreed upon for fully providing prescription drug benefits. Further, Defendants as fiduciaries of the ERISA Plans are entitled to receive at most reimbursement for their direct expenses. Moreover, the contract or arrangement was unreasonable because the Defendants failed to disclose Overcharge/Spread/ Clawback compensation pursuant to DOL Rule 408b-2(c).

148.    Defendants also received transfers of plan assets in that they received Plan and employer payments under coinsurance Plans through Clawbacks. ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

149.    In addition, Defendants used — and misused — assets of the ERISA Plans by leveraging the contracts underpinning these ERISA Plans to gain access to patients who needed prescription drugs and would be required to pay copayments, coinsurance, or deductible payments which Defendants could appropriate in their Overcharge and Clawback Scheme. Further, Defendants used — and misused — for their own benefit and the benefit of other parties in interest additional assets of the ERISA Plans — the contracts underpinning the ERISA Plans of members of the Class — to effectuate their Overcharge and Clawback Scheme. ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

150.    Plaintiff and the Class have suffered losses and/or damages and/or Defendants have been unjustly enriched in the amount of the Overcharges and Clawbacks Defendants took for themselves.

151.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

152.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff and the Class, including but not limited to:

    (a)    an accounting;

    (b)    a surcharge;

    (c)    correction of the transactions and readjudication of claims;

(d)      disgorgement of profits;

(e)      an equitable lien;

(f)      a constructive trust;

(g)      restitution;

(h)      full disclosure of the foregoing acts and practices;

(i)      an injunction against further violations; and/or

(j)      any other remedy the Court deems proper.

### Count III

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Violations of ERISA § 406(b)(1),(3), 29 U.S.C. § 1106(b)(1),(3)**

153.     Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

154.     ERISA § 406(b), 29 U.S.C. § 1106(b), provides that a fiduciary shall not (1) deal with plan assets in its own interest or for its own account, (2) act in any transaction involving the plan on behalf of a party whose interests are adverse to the interests of participants or beneficiaries, or (3) receive any consideration for its own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

155.     As alleged above, Defendants are fiduciaries to the ERISA Plans. They violated all three subsections of ERISA § 406(b).

156.     As alleged above, (i) cost-sharing payments by Plans and employers or trusts under coinsurance Plans, (ii) the contracts underpinning the Class members' ERISA Plans, and (iii) Plan contributions are plan assets under ERISA.

157.     First, (1) by setting their own compensation from Plan and employer cost-sharing payments and taking their own compensation from that same source, and (2) by using Plan

- 45 -

contracts in their own interest or for their own account to effectuate the Overcharge and

Clawback scheme, Defendants violated ERISA § 406(b)(1). As to the latter, Defendants acted in

their own self interest in using their authority over prescription drug benefit management and

administration derived from the insurance policies, ASO contracts, and PBM agreements to

design and implement the Overcharge and Clawback scheme for their own benefit.

158.    Second, by acting on behalf of each other, themselves, and their affiliates, to

profit from Overcharges and Clawbacks at the expense of Plaintiff and members of the Class —

and thus acting with parties with interests adverse to the affected participants and beneficiaries

— each Defendant engaged in a conflicted transactions each time it took Clawbacks in violation

of ERISA § 406(b)(2). Under this subsection of ERISA § 406(b), plan assets need not be

involved — dealing with a plan is enough.

159.    Third, through their Overcharge and Clawback Scheme, Defendants violated

ERISA § 406(b)(3) because they received consideration for their own personal accounts from

other parties — including each other, pharmacies, Plans, employers, trusts, and the members of

the Class — that were dealing with the ERISA Plans in connection with a transaction (a

prescription drug transaction) involving the assets of the ERISA Plans.

160.    Plaintiff and the Class have been damaged and suffered losses in the amount of

the Overcharges and Clawbacks Defendants took through these prohibited transactions.

161.    ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or

beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision

of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to

redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

162.     Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff and the Class, including but not limited to:

(a)     an accounting;

(b)     a surcharge;

(c)     correction of the transactions and readjudication of claims;

(d)     disgorgement of profits;

(e)     an equitable lien;

(f)     a constructive trust;

(g)     restitution;

(h)     full disclosure of the foregoing acts and practices;

(i)     an injunction against further violations; and/or

(j)     any other remedy the Court deems proper.

**Count IV**

**ERISA § 502(a)(2) and (3), 29 U.S.C. § 1132(a)(2) and (3)**
**for Violations of ERISA §§ 404, 29 U.S.C. § 1104**

163.     Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

164.     ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), provides that a fiduciary shall discharge its duties with respect to a plan in accordance with the documents and instruments governing the plan.

165.     Defendants failed to discharge their duties in accordance with the documents and instruments governing the ERISA Plans by requiring pharmacies to charge participants and beneficiaries cost-sharing payments that exceeded the limits imposed by the ERISA Plans, as alleged above.

166.    ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), further provides that a fiduciary shall discharge its duties with respect to a plan (1) solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of administering the plan ("loyalty") and (2) with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims ("prudence").

167.    In setting the amount of and charging Overcharges and taking Clawbacks, Defendants have breached their fiduciary duties of loyalty and prudence and have violated the terms of the Plans.

168.    Specifically, Defendants acted in furtherance of their own interests and the interests of their affiliates, and thus failed to act solely in the interests of participants and beneficiaries of the ERISA Plans, by requiring pharmacies to charge Overcharges and to remit Clawbacks.

169.    Defendants failed to act with the exclusive purpose of defraying reasonable expenses of administering the ERISA Plans by using their fiduciary control and discretion to require pharmacies collect Overcharges from participants and beneficiaries.

170.    Defendants failed to act with the care, skill, prudence, and diligence that a prudent PBM, insurer, and/or plan administrator would have used in similar circumstances by operating their Overcharge and Clawback scheme.

171.    The duties of loyalty and prudence also entail: (a) a negative duty not to misinform; (b) an affirmative duty to inform when the fiduciary knows or should know that

- 48 -

silence might be harmful; and (c) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries.

172.    Defendants breached the duty to inform by (i) misrepresenting to participants and beneficiaries the proper cost-sharing amounts in both the Plan terms and when participants and beneficiaries filled their prescriptions and were charged by pharmacies; (ii) failing to disclose to participants and beneficiaries the proper cost-sharing amounts, the manner in which they charged for prescription drugs, and the fact that the actual practices of charging and collecting cost-sharing payments for prescription drugs differ from the Plan terms; and (iii) prohibiting pharmacies from disclosing to participants and beneficiaries the existence or amount of the Overcharges, Spread, and Clawbacks and the fact that participants and beneficiaries could purchase drugs at a price lower than the amount set by Defendants.

173.    In addition, a fiduciary that appoints another person to fulfill all or part of its duties, by formal or informal hiring, subcontracting, or delegation, assumes the duty to monitor that appointee to protect the interests of the ERISA participants and beneficiaries. As noted herein, the power to appoint, retain, and remove plan fiduciaries or service providers confers fiduciary status upon the person holding such power.

174.    Finally, it is never prudent to require or allow excessive compensation in the context of an ERISA-covered plan. In so doing, Defendants violated their duty of prudence.

175.    Plaintiff and the Class have been damaged and suffered losses in the amount of their cost-sharing payments that exceeded the limits under the ERISA Plans or otherwise were excessive and unreasonable, including the amount of Spread that was Clawed Back by Defendants.

176.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach and to restore to the plan any profits the fiduciary made through use of the plan's assets. ERISA § 409 further provides that such fiduciaries are subject to such other equitable or remedial relief as a court may deem appropriate.

177.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant, beneficiary, or fiduciary to bring a suit for relief under ERISA § 409.

178.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

179.     Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff and the Class, including but not limited to:

(a)     an accounting;

(b)     a surcharge;

(c)     correction of the transactions and readjudication of claims;

(d)     disgorgement of profits;

(e)     an equitable lien;

(f)     a constructive trust;

(g)     restitution;

(h)     full disclosure of the foregoing acts and practices;

(i)     an injunction against further violations; and/or

- 50 -

(j)      any other remedy the Court deems proper.

## Count V

### ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
### for Violations of ERISA § 405(a), 29 U.S.C. § 1105(a)

180.    Plaintiff incorporates by reference each and every allegation above as if set forth fully herein.

181.    As alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence and they were prohibited from engaging in self-interested and conflicted transactions.

182.    As alleged above, ERISA § 405(a), 29 U.S.C. § 1105(a), imposes liability on a fiduciary, in addition to any liability which it may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it knows of a breach and fails to remedy it, knowingly participates in a breach, or enables a breach. The Defendants breached all three provisions.

183.    **Knowledge of a Breach and Failure to Remedy.** ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if it has knowledge of a breach by such other fiduciary, unless it makes reasonable efforts under the circumstances to remedy the breach. Upon information and belief, each Defendant knew of the breaches by the other fiduciaries and made no efforts, much less reasonable ones, to remedy those breaches.

184.    **Knowing Participation in a Breach.** ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), imposes liability on a fiduciary for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if it participates knowingly in, or knowingly undertakes

- 51 -

to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach. Upon information and belief, each Defendant participated in the breaches by the other fiduciaries.

185.   **Enabling a Breach.** ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), imposes liability on a fiduciary if, by failing to comply with ERISA § 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of its specific responsibilities which give rise to its status as a fiduciary, it has enabled another fiduciary to commit a breach, even without knowledge of the breach. Upon information and belief, each Defendant enabled the breaches by the other fiduciaries.

186.   Plaintiff and the Class have been damaged in the amount of the Overcharges.

187.   ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), authorizes a participant or beneficiary to bring a civil action: "(A) to enjoin any act or practice which violates any provision of this title or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this title or the terms of the plan."

188.   Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff and the Class, including but not limited to:

(a)   an accounting;

(b)   a surcharge;

(c)   correction of the transactions and readjudication of claims;

(d)   disgorgement of profits;

(e)   an equitable lien;

(f)   a constructive trust;

(g)   restitution;

(h)   full disclosure of the foregoing acts and practices;

- 52 -

(i)  an injunction against further violations; and/or

(j)  any other remedy the Court deems proper.

## Count VI

**ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)**
**for Knowing Participation in Violations of ERISA**

189.  Plaintiff incorporates by reference each and every allegation above as if set forth

fully herein.

190.  As noted above, fiduciary status is not required for liability under ERISA where

non-fiduciaries participate in and/or profit from a fiduciary's breach or prohibited transaction.

Accordingly, Plaintiff makes claims against Defendants to the extent that one or more of them

may be found not to have fiduciary status with respect to the ERISA Plans. As nonfiduciaries,

they nevertheless must restore unjust profits or fees and are subject to other appropriate equitable

relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and pursuant to *Harris Trust &*

*Sav. Bank v. Salomon Smith Barney Inc.*, 530 U.S. 238 (2000).

191.  Defendants had actual or constructive knowledge of and participated in and/or

profited from the prohibited transactions and fiduciary breaches alleged in Counts II-V by the

Defendants who are found to be fiduciaries. Accordingly, Defendants, even if found to be

nonfiduciaries, are liable to disgorge ill-gotten gains and/or plan assets and to provide other

appropriate equitable relief, pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), and *Harris*

*Trust*.

192.  As a direct and proximate result of the fiduciary breaches and prohibited

transactions alleged in Counts II-IV, Plaintiff and the members of the Class lost the Overcharges

that were improperly used to generate profits for the Defendants, their affiliates, and third

parties. Defendants collected and/or paid these amounts to themselves, their affiliates, or third

- 53 -

parties from plan assets or generated them through improper leveraging of plan assets. Defendants, even to the extent they are found not to be fiduciaries, received these excessive payments and retained them for their own accounts.

193.     Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Court should order equitable relief to Plaintiff and the Class, including but not limited to:

(a)     an accounting;

(b)     a surcharge;

(c)     correction of the transactions and readjudication of claims;

(d)     disgorgement of profits;

(e)     an equitable lien;

(f)     a constructive trust;

(g)     restitution;

(h)     full disclosure of the foregoing acts and practices;

(i)     an injunction against further violations; and/or

(j)     any other remedy the Court deems proper.

*     *     *     *

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for relief as follows as applicable for the particular claim:

A.     Certifying this action as a class action and appointing Plaintiff and the counsel listed below to represent the Class;

B.     Finding that Defendants are fiduciaries and/or parties in interest as defined by ERISA;

C.      Finding that Defendants violated their fiduciary duties of loyalty and prudence to Class members and awarding Plaintiff and the Class such relief as the Court deems proper;

D.      Finding that Defendants engaged in prohibited transactions and awarding Plaintiff and the Class such relief as the Court deems proper;

E.      Finding that Defendants denied Plaintiff and the Class benefits and their rights under the policies and awarding such relief as the Court deems proper;

F.      Enjoining Defendants from further such violations;

G.      Finding that Plaintiff and the Class are entitled to clarification of their rights under the ERISA Plans and awarding such relief as the Court deems proper;

H.      Awarding Plaintiff and the Class damages, surcharge, and/or other monetary compensation as deemed appropriate by the Court;

I.      Ordering Defendants to restore all losses to Plaintiff and the Class and disgorge unjust profits and/or other assets of the ERISA Plans

J.      Adopting the measure of losses and disgorgement of unjust profits most advantageous to Plaintiff and the Class to restore Plaintiff's losses, remedy Defendants' windfalls, and put Plaintiff in the position that she would have been in if the fiduciaries of the ERISA Plans had not breached their duties or committed prohibited transactions;

K.      Ordering other such remedial relief as may be appropriate under ERISA, including the permanent removal of Defendants from any positions of trust with respect to the ERISA Plans of the members of the Class and the appointment of independent fiduciaries to serve in the roles Defendants occupied with respect to the ERISA Plans of the Class, including as pharmacy benefit administrators and managers;

- 55 -

L.      Awarding Plaintiff and the Class equitable relief to the extent permitted by the above claims;

M.      Finding that Defendants are jointly and severally liable as fiduciaries and/or co-fiduciaries and/or parties in interest;

N.      Awarding Plaintiff's counsel attorneys' fees, litigation expenses, expert witness fees and other costs pursuant to ERISA § 502(g)(1), 29 U.S.C. 1132(g)(1), and/or the common fund doctrine;

O.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

P.      Finding that Defendants are jointly and severally liable for all claims; and

Q.      Awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amounts.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury.

Dated: October 19, 2018

Respectfully submitted,

/s/ Vincent L Greene
Vincent L. Greene
**MOTLEY RICE LLC**
55 Cedar Street, Suite 100
Providence, RI 02903
Telephone: 401-457-7730
Facsimile: 401-457-7708
vgreene@motleyrice.com

- 56 -

Of counsel:

William H. Narwold
Mathew Jasinski
**MOTLEY RICE LLC**
One Corporate Center
20 Church Street, 17th Floor
Hartford, CT 06103
Telephone: 860-882-1681
Facsimile: 860-882-1682
bnarwold@motleyrice.com
mjasinski@motleyrice.com

Robert A. Izard
Craig A. Raabe
Christopher M. Barrett
**IZARD, KINDALL & RAABE, LLP**
29 South Main Street, Suite 305
West Hartford, CT 06107
Telephone: 860-493-6292
Facsimile: 860-493-6290
rizard@ikrlaw.com
craabe@ikrlaw.com
cbarrett@ikrlaw.com

Ronen Sarraf
Joseph Gentile
SARRAF GENTILE LLP
10 Bond Street, Suite 212
Great Neck, NY 11021
Telephone: 516-699-8890
Facsimile: 516-699-8968
ronen@sarrafgentile.com
joseph@sarrafgentile.com

Attorneys for Plaintiff